**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**KELVIN DANIELS**, Individually and on behalf
of all those similarly situated,

Case No.: 8:19-cv-2612-T-35SPF

      Plaintiff,

v.

**GOVERNMENT EMPLOYEES INSURANCE**
**COMPANY**,

      Defendant.

_____/

**DEFENDANT GOVERNMENT EMPLOYEES INSURANCE COMPANY'S**
**MOTION AND SUPPORTING MEMORANDUM TO DISMISS OR STAY**
**PLAINTIFF'S CLASS ACTION COMPLAINT**

Defendant, Government Employees Insurance Company ("GEICO"), moves to dismiss

Plaintiff's Class Action Complaint and Demand for Jury Trial (Dkt. 1-1) (the "Complaint") with

prejudice for failure to state a claim for relief under Federal Rule of Civil Procedure 12(b)(6), or

stay this case pending resolution of *Jones v. Gov't Employees Ins. Co.*, ("*Jones*") 6:17-cv-891-Orl-

40LRH, 2019 WL 1490703 (M.D. Fla. April 4, 2019).  The grounds and authority for this Motion are

set forth in the following supporting memorandum, which is incorporated herein.

**<u>MEMORANDUM</u>**

Plaintiff alleges that an accident rendered his car (the "Camaro"), which was insured

under a GEICO auto insurance policy ("Policy"), a total loss.  Compl., ¶ 37.  In offering to settle

Plaintiff's subsequent insurance claim, GEICO provided Plaintiff a 20-page report ("CCC

Report"), with information on how the Camaro's value and GEICO's settlement offer were

derived.  *Id.* ¶ 39; s*ee also* CCC Report, Compl., Ex. A.  Plaintiff alleges GEICO breached the

Policy in four ways (although he only asserts three breach of contract causes of action) when he

settled his claim with GEICO, and he seeks a declaration related to these past alleged breaches. Plaintiff also seeks to represent a class of Florida GEICO insureds.

As an initial matter, the Court should dismiss each cause of action because each is based on a statute (which Plaintiff claims is incorporated into the Policy) that provides no private right of action. Each cause of action relies on Fla. Stat. § 626.9743, but Plaintiff has no private right of action to enforce that statute, and he cannot circumvent this prohibition by arguing that his policy incorporates the statute.

Count I – Plaintiff's declaratory relief claim – also fails because: (1) Plaintiff does not and cannot allege a serious risk of continuing irreparable injury; (2) Plaintiff has an adequate remedy at law; and (3) the claim is wholly duplicative of the others.

Count II – which claims GEICO violated § 626.9743 and breached the Policy by using the "CCC System" to derive the value of the Camaro – also fails because: (1) Plaintiff has not plausibly alleged that the CCC System does not comply with statutory provisions that permit the use of (i) the cost of two or more comparable motor vehicles available in the local market area; (ii) a generally recognized used motor vehicle industry source; or (iii) any other method as long as supporting documentation is provided to the insured; and (2) Plaintiff identifies no policy term precluding GEICO from using the CCC System to derive the vehicle's value.

Count III – which claims GEICO violated § 626.9743 and breached the Policy by not paying estimated title and license fees, or dealer fees he "would presumptively incur" if he purchased a replacement vehicle – also fails because: (1) neither the statute nor the Policy requires GEICO to pay such fees; (2) Plaintiff does not allege damage because he does not allege he incurred, or would incur, such fees; and (3) Plaintiff's allegations regarding dealer fees are not plausible.

Count IV – which claims GEICO violated § 626.9743 and breached the Policy by taking the Camaro it paid for without paying an additional amount for the salvage value – fails because:

(1) by paying the total loss value of the Camaro, GEICO paid for its salvage value; and (2) the Policy expressly permits GEICO to take ownership of the Camaro after paying the appraised value. What Plaintiff seeks is an improper double payment for the salvage value of the vehicle.

If the case is not dismissed, this case should be stayed because Plaintiff's claims overlap with the breach of contract claims in *Jones*, another class action lawsuit against GEICO, filed long before this one, in which Plaintiff is a class member. On October 29, 2019, the parties filed a notice of settlement in *Jones*. *Jones*, 6:17-cv-891-Orl-40LRH, Docket at 191. Proceeding with this suit while the earlier-filed suit remains pending risks duplicative discovery and motion practice, inconsistent rulings, and a waste of judicial resources. Staying this case so that the pending claims can reach final resolution on the merits, however, would conserve court and judicial resources.

## I. FLA. STAT. § 626.9743, ON WHICH EACH OF PLAINTIFF'S CLAIMS IS BASED, PROVIDES NO PRIVATE RIGHT OF ACTION

Plaintiff's claims should be dismissed as they are incurably defective because they are based on GEICO's alleged breach of § 626.9743, which Plaintiff claims is incorporated into the Policy. *E.g.*, Compl., ¶¶ 4, 17, 64-66, 76-77, 81, 85, 90. There is, however, no private right of action for alleged violations of § 626.9743. *See* Fla. Stat. § 626.9631. Nor can Plaintiff create such a right by asserting the statute is incorporated into the Policy and claiming breach of contract.

Section 626.9743 is part of Florida's Unfair Insurance Trade Practices Act ("UITPA"). The UITPA does not create a private right of action unless specifically provided in the statute. *Joseph v. Bernstein*, 612 F. App'x 551, 557 (11th Cir. 2015); *Buell v. Direct Gen. Ins. Agency, Inc.*, 267 F. App'x 907, 909 (11th Cir. 2008) ("*Buell II*"); *Keehn v. Carolina Cas. Ins. Co.*, 758 F.2d 1522, 1523–25 (11th Cir. 1985). The UITPA "'is a regulatory statute,' and has been

3

construed as 'only preserving those causes of action that a party had available to him prior to the enactment of that Act.'"  *Espana Informatica, S.A. v. Top Cargo, Inc.*, 2008 WL 11331683, at *10 (S.D. Fla. Apr. 28, 2008) (quoting and citing *Cycle Dealers Ins., Inc. v. Bankers Ins. Co.*, 394 So. 2d 1123, 1125 (Fla. Dist. Ct. App. 1981)).  The UITPA provides no civil remedy and creates no private cause of action for violations.  *West Coast Life Ins. v. Life Brokerage Partners, LLC*, 08-80897-CIV, 2009 WL 2872823, at *8 (S.D. Fla. Sept. 2, 2009).

Plaintiff may not pursue a breach of contract claim disguised as a private right of action for a violation of § 626.9743.  "Judicially inventing a right to sue—based on a statute that provides no right to sue—arrogates to the judiciary a power of the legislature" and "ignores not only the formal separation of powers but also the legislature's superior legislative competence"—courts should be cautious when allowing plaintiffs to bring an equitable common law claim premised on a violation of a statute that provides no explicit statutory cause of action. *Lemy v. Direct General Finance Co.*, 884 F. Supp. 2d 1236, 1238 (M.D. Fla. 2012) *affirmed at* 559 Fed. Appx. 796 (11th Cir. 2014) (denying reconsideration of dismissal of common law claims based on violation of insurance statute); *see also QBE Ins. Corp. v. Chalfonte Condo. Apt. Ass'n*, 94 So. 3d 541, 552-53 (Fla. 2012) (declining to reform an insurance policy based on failure to comply with a statute for which no private right of action was permitted because the statute did not provide for that remedy and "courts cannot provide a remedy when the Legislature had failed to do so").

According to Plaintiff, when settling a total loss, GEICO "must pay its insured the vehicle's actual cash value as defined in and pursuant to Fla. Stat. § 626.9743."  Compl. ¶ 17. Quoting the statute, Plaintiff claims GEICO must pay "the actual cost to purchase a comparable

motor vehicle, including sales tax." *Id.*  Because Plaintiff's claims are expressly premised on the statute, they must be dismissed.

Even if § 626.9743 was incorporated into the Policy, the entire regulation would be incorporated, including the preclusion of a private right of action.  The Court should not allow Plaintiff to circumvent that express language by asserting common-law breach of contract claims based on alleged violations of the regulation.  *See* Compl., ¶¶ 4, 17, 64-66, 76-77, 81, 85, 90.  The Eleventh Circuit rejected this exact tactic, holding that "the UITPA affords plaintiffs *no cause of action*, either by its own terms *or incorporation into the contract of insurance*."  *Keehn*, 758 F.2d at 1525 (emphases added).  If the statute was incorporated into the Policy, "the *entire* UITPA was incorporated . . ., including Fla. Stat. § 626.9631 and the other provisions of the statute providing an administrative remedy only for violations thereof." *Id.*  (emphasis in original).  Plaintiff "may not evade the Florida legislature's decision to withhold a statutory cause of action for violations of the pertinent provisions of FUITPA by asserting common law claims based on such violations." *Buell II*, 267 F. App'x at 909.  This Court must reject Plaintiff's attempt to shoehorn a barred claim into breach of contract and declaratory judgment claims.

## II.   COUNT I MUST BE DISMISSED BECAUSE PLAINTIFF FAILS TO ALLEGE ANY FUTURE HARM OR THE ABSENCE OF AN ADEQUATE LEGAL REMEDY AND BECAUSE IT IS SUBSUMED BY THE OTHER CLAIMS

Count I seeks declarations on the same alleged breaches of contract for which Plaintiff seeks damages in Counts II through IV.  Compl., ¶ 64.  As with Counts II through IV, Plaintiff's declaratory relief claim fails for the reasons the equivalent breach of contract claims fail as discussed herein.  Count I should also be dismissed because it cannot be maintained as a separate declaratory relief claim.

For declaratory relief, Plaintiff "must establish that there was a violation, that there is a serious risk of continuing irreparable injury if the relief is not granted, and the absence of an adequate remedy at law." *Bolin v. Story*, 225 F.3d 1234, 1242 (11th Cir. 2000). Plaintiff fails to meet any of these requirements here.[1]

Plaintiff has not alleged that failing to grant the requested relief will expose him to a "serious risk of continuing irreparable injury." *Id.* Nor can he. Any risk of future harm posed by GEICO's alleged conduct is contingent on the unlikely possibility that Plaintiff will suffer another total loss while insured by GEICO. *See Malowney v. Fed. Collection Deposit Grp.*, 193 F.3d 1342, 1347 (11th Cir. 1999) (affirming dismissal of declaratory judgment claim because "[t]here must be a substantial likelihood that the plaintiff will suffer future injury: a 'perhaps' or 'maybe' chance is not enough"). In fact, Plaintiff fails to allege he even currently has an insurance policy with GEICO such that a future total loss claim under a GEICO policy would even be possible. *See* Compl., ¶ 37 (alleging that the Camaro was in an accident and "[a]t that time" Plaintiff was a named insured under the GEICO policy).

Plaintiff also cannot allege he lacks an adequate remedy at law. This is because he in fact has a remedy—namely, money damages for the alleged breach of contract. Where a plaintiff alleges an insurer has failed to fully compensate him for an insurance claim, declaratory relief is unavailable. *Tiller v. State Farm Mut. Auto. Ins. Co.*, 549 F. App'x. 849, 855 (11th Cir. 2013) (declaratory relief unavailable because plaintiffs "complain[ed] that [the insurer] has not fully compensated them . . . but all of these acts took place in the past, and could be redressed through legal remedies"); *State Farm Mut. Auto. Ins. Co. v. Altamonte Springs Diagnostic Imaging, Inc.*, No. 6:11-CV-1373-ORL-31GJK, 2012 WL 1565387, at *4 (M.D. Fla. May 2, 2012) (dismissing

---

[1] Plaintiff's failure to allege a "violation" is discussed below and not repeated here.

declaratory judgment claim because past underpayments of insurance claims could be adequately remedied by damages, and possibility of future claims was "speculative future harm").

Plaintiff's declaratory relief claim is also based on the same factual allegations and legal theories as the breach-of-contract claim.[2]  Even assuming Plaintiff stated a breach of contract claim (which he did not), the declaratory relief claim is duplicative and must be dismissed.  *See, e.g., Hinds v. Am. Sec. Ins. Co.*, 2016 WL 8677863, at *7 (S.D. Fla. Sept. 9, 2016) (collecting cases); *Fernando Grinberg Tr. Success Int. Properties LLC v. Scottsdale Ins. Co.*, No. 10-20448-CIV, 2010 WL 2510662, at *1 (S.D. Fla. June 21, 2010) (where "determination of [a] breach of contract claim . . . involves the same factual dispute as the declaratory judgment claim . . .  the [p]laintiff will be able to secure full, adequate and complete relief through the breach of contract claim").

## III.  COUNT II FAILS BECAUSE PLAINTIFF FAILS TO PLAUSIBLY ALLEGE THAT THE CCC REPORT DOES NOT COMPLY WITH THE REGULATIONS OR THE POLICY, AND TO ALLEGE DAMAGES

### A.  Plaintiff Fails to Plausibly Allege That The CCC System Does Not Comply With Fla. Stat. § 626.9743

Section 626.9743(5) prescribes methods to derive the "actual cash value," or "actual cost to purchase a comparable motor vehicle," of first-party total loss vehicles.  Although Plaintiff conclusorily asserts that the CCC System violates § 626.9743(5), his other allegations demonstrate that this conclusion is not plausible regarding subsections (5)(a)1, (5)(a)2 and (5)(c).  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (legal conclusions receive no deference on a motion to dismiss).

#### i.  *The CCC System Used Comparable Motor Vehicles Available In the Local Market Area*

---

[2] *Compare* Compl., ¶¶ 63-66 (incorporating the facts and theories in paragraphs 1-53 and adding only a recitation of the elements for a declaratory relief claim) *with id.* ¶¶ 80-92 (incorporating paragraphs 1-53 into all three breach-of-contract claims and adding only a recitation of the elements for each claim).

Plaintiff does not plausibly allege that the CCC Report purportedly used to settle his claim does not comply with § 626.9743(5)(a)1, which says that, "[w]hen comparable motor vehicles are available in the local market area," an insurer may derive the "actual cash value" from "the cost of two or more comparable motor vehicles available in the local market area within the preceding 90 days." Plaintiff alleges that the CCC System uses advertised prices of comparable vehicles "as close as possible to the insured's residence." Compl., ¶ 21. And the CCC Report for the Camaro used the advertised prices of 11 comparable vehicles that were available within the preceding 60 days from dealers 18 miles or less from the Camaro. Compl., ¶ 39; CCC Report, Compl., Ex. A at 42-45.

Plaintiff's legal conclusion that (5)(a)1 requires an insurer to use "the actual sales prices" of comparable vehicles, instead of advertised price, finds no support in the statute. Compl., ¶ 28. The statute makes no reference to "actual sales prices," but specifically references comparable vehicles that "are available in the local market area," which would have to be advertised for sale, if they are available. Similarly, the statute does not require GEICO to use "the highest advertised prices" of advertised vehicles, nor prohibit the use of an electronic database or system, as Plaintiff claims. *See id.* at ¶¶ 27-28 (arguing the statute imposes these requirements). The subsection simply permits the use of two or more comparable vehicles. To read a prohibition against use of a database into the statute would lead to absurd results because an insurer then could derive a vehicle's value using a printed or spoken advertisement, but could not use that same information if it was stored in a database. Plaintiff's created restriction would also drive up costs, as it would unnecessarily require GEICO to search printed advertisements for comparable vehicles every time it has to derive the value of a total loss vehicle, sacrificing any efficiency that

could be realized by compiling the information in a database.  That cannot be what the legislature intended.

Plaintiff's damages theory – that using advertised prices, instead of sale prices leads to lower valuation – is also implausible.  Compl., ¶¶ 3, 25, 27-29, 39.  Used car sales prices are negotiated down from their advertised prices, not up.  *See Twombly*, 550 U.S. at 564-65 (assessing plausibility requires allegations to be "viewed in light of common economic experience").  People do not negotiate to pay more than an advertised price.  If anything, the CCC System's use of advertised prices provided a higher valuation than if the system used the final sale prices for the comparable vehicles.  Even had Plaintiff alleged a statutory violation, and could assert a private right of action, he has not plausibly alleged damage for that violation. *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009) ("Florida law requires the plaintiff to plead and establish: (1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach").

### ii.   *Plaintiff Does Not Plausibly Allege That The CCC System Is Not A Generally Recognized Used Motor Vehicle Industry Source*

Plaintiff does not plausibly allege that the CCC System does not comply with § 626.9743(5)(a)2.a, which permits an insurer to derive the "actual cash value" from "a generally recognized used motor vehicle industry source," such as "[a]n electronic database," as long as "the pertinent portions of the valuation documents generated by the database are provided by the insurer to the first-party insured upon request."

Although Plaintiff proffers a legal conclusion that the CCC System is not "a generally recognized used motor vehicle industry source," he alleges no facts plausibly supporting that conclusion.  *See* Compl., ¶ 27.  As a threshold matter, GEICO, and other insurers, participate in the used motor vehicle industry by insuring numerous used motor vehicles.  Compl., ¶¶ 11-12.

9

Plaintiff also alleges GEICO and other insurers price, purchase, and sell used motor vehicles, particularly in the total loss context. *E.g.*, *id.* ¶¶ 35-36 (alleging GEICO takes ownership of salvage vehicles); *see also Twombly*, 550 U.S. at 564-65 (assessing plausibility requires allegations to be "viewed in light of common economic experience"). Insurance companies are undoubtedly buyers and sellers in the used motor vehicle industry.

Although he tries to limit the used motor vehicle industry to auto dealers and brokers, Plaintiff concedes the industry includes more than just auto dealers and brokers. *See* Compl., ¶ 27 (referring to "consumer[s]"). The Florida legislature could have limited this subsection to sources generally recognized by "used motor vehicle dealers and brokers," but chose language encompassing the entire industry, including purchasers, sellers, financers, and insurers. *See, e.g.*, Fla. Stat. § 320.60(11)(a) (defining "motor vehicle dealer," which is not incorporated into § 626.9743(5)(a)(2)). Plaintiff's unsupported assertion that insurers are not part of the used motor vehicle industry must be disregarded. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("naked assertions" devoid of any "factual enhancement" fail to state a claim).

Nor does the statute require that the database be "marketed" to "car dealers and brokers" or "available to Daniels as a consumer," as Plaintiff tries to require. *See* Compl., ¶ 27; Fla. Stat. § 626.9743(5)(a)2.a. The statute merely requires that the database be "generally recognized" in the industry. Just because a product is not marketed to a particular segment of an industry does not mean the product is not "generally recognized" in that industry, and Plaintiff has alleged no facts suggesting the CCC System is not generally recognized. Further, Plaintiff himself states that multiple insurance companies use and rely on the CCC System, illustrating its wide acceptance. *E.g.,* Compl., ¶¶ 25, 27.

Plaintiff alleges GEICO relied on an electronic database and, by attaching the CCC Report to his Complaint, concedes GEICO produced "the pertinent portions of the valuation documents generated by the database."   Compl., ¶¶ 18-19; CCC Report, Compl., Ex. A at 36 ("CCC maintains an extensive database of vehicles that currently are or recently were available for sale in the U.S.").

### iii.   GEICO Supported Its Determination With Documentation, Itemized And Specified Deductions In Appropriate Dollar Amounts, And Explained The Basis For Settlement

Plaintiff does not plausibly allege that the CCC Report purportedly used to settle his claim does not comply with § 626.9743(5)(c), which permits an insurer to derive the "actual cash value" of a total loss vehicle based on a method that "varies" from the other methods if the value "is supported by documentation," deductions from the value are itemized and specified in appropriate dollar amounts, and the basis is explained to the claimant in writing, "if requested."[3]

The CCC Report itemizes and specifies adjustments due to betterment or depreciation by: (1) identifying the mileage and specific features of the Camaro that were considered; (2) providing detailed inspection notes describing the condition of various Camaro components; (3) listing specific dollar amounts by which the Camaro's value was adjusted because of the condition of the components; (4) explaining the reasoning for the dollar adjustments; and (5) providing a total written estimate that reflects an upward adjustment of $266 to the Camaro's value based on the inspected components' condition.  Compl. at Ex. A at 1–7.  The CCC Report includes specific itemized comparisons for each comparable vehicle; identifies the mileage and

---

[3] The documentation requirement is similar to the requirement 626.9743(6), which applies to the entire section, and recognizes adjustments will be made to the prices of comparable vehicles by permitting deductions because of betterment or depreciation.  Plaintiff's reference to subsection (6), demonstrates why there is no private right of action for a violation of the statute.  *See* Compl. ¶ 32 (alleging the section "requires GEICO to maintain" information in each insureds claim file, "GEICO does not do so," and it may not do so without maintaining the documentation).  Plaintiff's complaint about maintaining documentation in a claim file is irrelevant to whether GEICO paid Plaintiff the correct amount, but may be relevant to Florida's insurance regulator.

the numerous components present, or absent, in each vehicle; lists specific written dollar amounts by which each vehicle's value was adjusted to account for differences in the make, model or trim, options, mileage, and condition; and lists the adjusted comparable value for each vehicle.  *Id.* at 8–15.

The CCC Report also itemizes the "Uniform Condition Adjustments," which are applied to the comparison vehicles to set those dealer advertised vehicles from dealer condition to private condition.  *Id.* at 8-9.  Plaintiff's complaint that these adjustments should not be uniform either misinterprets or misrepresents the adjustment.  *Id.* at ¶ 23.  The CCC Report derived a "Base Vehicle Value" by identifying the price of 11 comparable vehicles advertised by dealers.  *Id.* at Ex. A at 9–15.  To make an apples-to-apples comparison, before averaging the advertised vehicles' values, the CCC Report makes upward and downward adjustments based on the package, make/model/trim, options, and mileage.  *Id.*

After these adjustments are made, the comparable vehicles, which are all dealer advertised, as opposed to privately owned, are similar to the loss vehicle except for one respect — condition.  A Uniform Condition Adjustment to each comparable vehicle sets the comparable vehicle to an Average Private condition, to which the Camaro is also compared.  *Id.*  One would expect those adjustments to be the same on vehicles otherwise adjusted to be similar as to options, mileage, and make/model/trim.  *Id.*[4]

The 20-page CCC Report documents and explains how the Camaro's value was determined, itemizes the deductions in appropriate dollar amounts, and explains the settlement offer in writing.  *See* CCC Report, Compl., Ex. A at 35-53; Total Loss Settlement Explanation,

---

[4] Although Plaintiff alleges GEICO should not have assumed the 11 comparable vehicles were in dealer retail condition, he alleges nothing about the condition of those vehicles, let alone something to suggest that this assumption was improper in his valuation. Plaintiff's mere speculation should not be considered in deciding a motion to dismiss.  *Twombly*, 550 U.S. at 555 (to withstand a motion to dismiss, "[f]actual allegations must be enough to raise a right to relief above the speculative level").

Compl., Ex. A at 32-33.  In fact, Plaintiff describes in precise detail how the Camaro's value was derived.  *E.g.*, Compl., ¶¶ 19-21, 39.  He also included with his Complaint GEICO's written explanation of its settlement offer.  Total Loss Settlement Explanation, Compl., Ex. A at 32-33.  Plaintiff's allegations confirm GEICO provided him with the information required by § 626.9743(5)(c).

The CCC Report provided Plaintiff with sufficient information to disagree with GEICO's valuation, if he thought it was incorrect, and challenge particular aspects of the valuation.  He had information about 11 comparable vehicles available within the preceding 60 days from dealers 18 miles or less from the Camaro, adjustments made to those vehicles for differences from the Camaro, and an explanation that the Camaro's value was decreased from the price of a dealer advertised vehicle by $742 because the Camaro's tires, body, glass, seats, and carpets were in average private or rough condition (an assessment he does not challenge).  Compl. at Ex. A at 6–7 (showing the total adjustment based on the Camaro's condition increased the value from Average Private by $266); *id.* at 8-9 (identifying the total difference between dealer retail and average private condition as $1,008).[5]  Plaintiff has not plausibly alleged GEICO failed to provide this information.

**B.      Plaintiff Identifies No Policy Term GEICO Breached By Using The CCC System**

Even if Plaintiff did not rely on § 626.9743 to assert that using the CCC System breaches the Policy's written terms, Count II must still be dismissed.  Without the statute, Plaintiff has identified no Policy language GEICO purportedly violated.  *See Branch Banking & Tr. Co. v. Appraisalfirst, Inc.*, 2010 WL 11596299, at *5 (S.D. Fla. July 7, 2010) (collecting Florida cases dismissing breach of contract claims where the plaintiff failed to identify the specific contractual

---

[5] The $1,008 total difference between Dealer Retail and Average Private condition less the $266 credited for the Camaro's actual condition is $742.

terms that the defendant allegedly breached); *Vega*, 564 F.3d at 1272 ("Florida law requires the plaintiff to plead and establish: (1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach").

Plaintiff partially quotes some Policy terms but does not allege GEICO breached any of those terms by using the CCC System, much less how it did so. *See* Compl., ¶ 15 (quoting parts of the Policy). Instead, he claims GEICO "must pay its insureds the vehicle's actual cash value as defined in and pursuant to Fla. Stat. § 626.9743." *Id.* ¶ 17. Plaintiff identifies no Policy term requiring GEICO to use NADA or Kelly Blue Book to derive the value of the Camaro. *See, e.g.*, *id.* ¶¶ 25, 26, 40, 41, 59. Nor can he do so, because no such term exists. *See generally* Policy, Ex. 1.[6] Without reference to the statute, Plaintiff has no claim.

## IV.   COUNT III FAILS BECAUSE THE POLICY COVERS THE DAMAGED PROPERTY, NOT THE COST OF LICENSES TO USE IT OR HYPOTHETICAL DEALER FEES, BECAUSE PLAINTIFF HAS NOT ALLEGED DAMAGES, AND BECAUSE PLAINTIFF'S DEALER FEE ALLEGATIONS ARE IMPLAUSIBLE

Plaintiff's Count III alleges GEICO breached the Policy, as reformed to conform with § 626.9743(5)(a), by not paying two different types of corollary expenses when he agreed to settle his total loss claim: (1) "title/license fees;" and (2) "dealer fees" that he "would *presumptively* incur." Compl. ¶¶ 86-87. Both claims fail because neither the statute nor the Policy requires GEICO to pay such corollary fees. Plaintiff also has not alleged he incurred these fees, so he failed to allege a breach or damages. As to the dealer fees, Plaintiff has not plausibly alleged that he will necessarily incur the fees.

### A.   Neither The Statute Nor The Policy Requires GEICO To Pay For Title/License Fees Or Dealer Fees

---

[6] The Court may consider the Policy because Plaintiff referred to it in his Complaint, it is central to Plaintiff's claim, and its authenticity is undisputed. *Hi-Tech Pharm., Inc. v. HBS Intl. Corp.*, 910 F.3d 1186, 1189 (11th Cir. 2018).

14

Section 626.9743(5)(a) does not mention "title fees," "license fees," or "dealer fees," much less require payment of such fees. It does, however, reference sales tax, which Plaintiff concedes GEICO paid. Fla. Stat. § 626.9743(5)(a); Compl., ¶¶ 34, 44. The legislature's inclusion of sales tax with no reference to "fees" confirms that the statute does not require payment for any such fees.[7] *See Buell v. Direct General Ins. Agency, Inc.*, 488 F. Supp. 2d 1215, 1218 (M.D. Fla. June 6, 2007) ("*Buell I*") (applying the doctrine of *inclusio unius est exclusio alterius*).[8] Plaintiff's claim that "the actual cost to purchase a comparable motor vehicle" as prescribed by § 626.9743(5)(a) includes the various fees he lists is belied by the Florida legislature's specific inclusion of sales tax and exclusion of these fees.

The Policy also does not mention these fees, nor does it require GEICO to pay them.[9] The definition of "actual cash value" in the Policy requires only that GEICO pay "the replacement cost of the auto or property less depreciation or betterment," not for collateral expenses that could be incurred for operating a replacement vehicle. *See* Compl., ¶ 15 (allegedly quoting the Policy). The Policy only covers "Loss," which is defined as "direct and accidental loss of or damage to: (a) An owned or non-owned auto, including its equipment." *Id.* The fees Plaintiff seeks are not "loss of or damage to" the Camaro, or its equipment. Instead, the

---

[7] Notably, the NADA report Plaintiff attached to his Complaint (one of the valuation methods he alleges complies with the statute) does not include the "fees" the statute allegedly requires, nor does Plaintiff even attempt to explain how such fees could be derived from the NADA report. *See* NADA Report, Compl., at 55; Compl., ¶¶ 25, 26, 40-41 (alleging NADA complies with the statute).

[8] *White v. Mederi Caretenders Visiting Servs. of Se. Fla., LLC*, 226 So. 3d 774 (Fla. 2017), does not change this long standing principal of law. *White* stated no bright line rule, but rather, a general principle. *Id.* at 781 ("Generally, it is improper to apply expressio unius to a statute in which the Legislature used the word 'include'"). *White* addressed open-ended statutory language—"includes, but is not limited to"—which necessarily implies a non-exhaustive list. *Id.* at 780 (quoting the statute). *White*, and the cases it cited, also involved the interpretation of statutes with exemplary *lists* of what the legislature was "including." Here, in contrast, the statute adds only one item (sales tax, if applicable), not a non-exclusive exemplary list. *Id.* at 780-81 (quoting the statute and citing cases). *White's* general principle does not apply here given the statute's wording and context (which only allows sales tax collection "if applicable pursuant to subsection (9)").

[9] GEICO acknowledges that *Roth v. GEICO General Insurance Company*, No. 16-62942-CIV, 2018 WL 3412852 (S.D. Fla. June 14, 2018), held that the same language as in the Policy required the defendant in that case to pay title fees to insureds who were leasing vehicles that were declared a total loss. GEICO also acknowledges that *Jones* decided that certain license/title fees are required to be paid. GEICO respectfully contends these cases were decided incorrectly, as discussed here.

"title/license fees" are additional costs that may be incurred to title or license a vehicle, and the "dealer fees" are additional costs that may or may not be incurred depending on from whom a vehicle is purchased.  The Policy provides no coverage for these fees.

GEICO's liability under the Policy is also limited to "the prevailing competitive price to . . . replace the property at the time of *loss.*  Policy, Ex. 1 at 15.  The alleged title, license, and dealer fees are not part of the "prevailing competitive price to" replace the Camaro.  Rather, the "title/license fees" are a collateral expense associated with operating the replacement vehicle that might be charged besides the actual cost of replacing the vehicle itself, and the dealer fees are additional costs that may be charged based on the chosen dealer.  The fees exceed the Policy's express liability limit and are excluded from coverage.

Nor can the fees be considered depreciation ("a decrease or loss in value to the auto or property because of use, disuse, physical wear and tear, age, outdatedness, or other causes") or betterment ("improvement to the auto or property to a value greater than its pre-loss condition"). Compl. ¶ 15.  The Policy's inclusion of "depreciation" and "betterment" demonstrates what is evident from use of the term "value" in "actual cash value:" the Policy covers the vehicle's monetary worth at the time of loss, not expenses associated with using the vehicle.

In *Schenck v. Windhaven Ins. Co.*, No. 16-2018-CA-000023 (Fla. 4th Cir. Ct., May 17, 2019), attached as Ex. 2, a Florida court agreed.  Interpreting a similar "actual cash value" policy provision as here, the Florida State court held that "[n]othing in the insurance contract entitles the Plaintiff to title transfer fees and license plate transfer fees."  *Id.* at 4-5, ¶ 5.  The policy limited coverage to the insured vehicle's "actual cash value," but did not define "actual cash value."  *Id.* at 3, ¶ 3.  Based on Florida case law, the court interpreted "actual cash value" to mean "the cost to replace the item minus any depreciation."  *Id.* (citing *Trinidad v. Fla.*

*Peninsula Ins. Co.*, 121 So. 3d 433 (Fla. 2013)).  The "cost to replace" the vehicle, according to *Schenck*, does not include title and license fees because the "vehicle can be replaced without the payment of title transfer fees and license transfer fees, although it may not be legally operated." *Id.* at 5, ¶ 5.  *Schenck* ruled that an "actual cash value" policy creates no coverage for title and license fees.  *See id.*

    *Sigler v. GEICO Casualty Co.*, No. 1:18-cv-01446-MMM-JEH, 2019 WL 2130137 (C.D. Ill. May 15, 2019), which was decided under Illinois law, and involved different fees (as it must), demonstrates the lack of coverage in the Policy for the types of fees Plaintiff seeks.  *Sigler* interpreted "actual cash value of the property" and held:

> Nothing in the plain language of the policy can reasonably be construed as an express promise to insureds that they will be reimbursed for sales tax, title transfer fees, and tag transfer fees without first incurring such costs . . . The claim is simply too speculative.

*Id.* at *3.

    Even where such fees are incurred, *Sigler* held that the defendant's obligation to reimburse an insured arose from an Illinois regulation (which does not exist in Florida) that **mandates** payment for "transfer and title fees," not from the policy language.  *Id.* ("This obligation only arises for insurers after cash settlements when the insured has purchased or leased a vehicle.  Ill. Admin. Code tit. 50, § 919.80(c)(3)(A)(i)."); *accord* Ill. Admin. Code tit. 50, § 919.80(c)(3)(A)(i) ("If a replacement vehicle is provided, the company is required to pay the applicable sales tax and transfer and title fees.").

## B.  <u>Plaintiff Fails To Allege Breach or Damage</u>

    Plaintiff does not allege he incurred any title/license fees or dealer fees.  *See generally* Compl.  Instead, with respect to "title/license fees" he asserts that it is a "reasonable assumption" that each putative class member—presumably including himself—will "incur a $75.25 transfer

of title fee without lien, a $2.50 title transfer service fee, a $4.50 license plate transfer fee, and a $1.00 air pollution control fee." *Id.* ¶ 59.  With respect to "dealer fees" he asserts that he and the class would "presumptively incur" these fees and he can "provide evidence of the average or typical dealer fee in Florida." *Id.* ¶¶ 59, 87.  Yet he does not and cannot point to anything in the Policy that requires GEICO to make or adopt such "assumptions" or "presumpti[ons]" and use them to prepay fees that have not been charged.  *See Branch Banking & Tr. Co.*, 2010 WL 11596299, at *5 (to state a breach-of-contract claim, the plaintiff must identify the specific contractual terms breached).  Similarly, because Plaintiff has not yet incurred any such fees, GEICO's alleged failure to prepay them cannot have caused him any damage.

### C.   Plaintiff Cannot Plausibly Allege He Will Incur Dealer Fees

Plaintiff fails to adequately allege he will incur discretionary dealer fees, which no statute or regulation requires, only might be charged, and, even if charged, only might be paid.   *See* Compl. ¶ 4 (alleging only that a "majority of used car dealer[s] in Florida" charge dealer fees). Plaintiff also fails to allege that he actually incurred dealer fees either in purchasing or replacing the Camaro; rather, his claim is based on speculation and generalizations unsupported by any factual allegation.

By qualifying his allegation about dealers charging fees, Plaintiff concedes that not all dealerships charge fees.  Compl. ¶ 4.  By offering to "provide evidence of the average or typical dealer fee in Florida," he also concedes that when a fee is allegedly charged, the amount varies. *Id.* at ¶ 59.  Ordinary experience confirms used car dealers often negotiate these discretionary fees to close a sale.  *See Twombly*, 550 U.S. at 555 (legal conclusions "couched as factual allegation[s]" need not be accepted as true) (quotation omitted).

Plaintiff's qualified statements about dealers who charge fees fails to allege anything about used car dealers that sell vehicles comparable to his own, such that he would be required to

pay it to replace the Camaro.  The Policy also requires GEICO to pay only the replacement cost of the Camaro, limited to the prevailing competitive cost to replace it.  Compl. ¶ 15.  Even if dealer fees are part of the actual cash value, Plaintiff alleges no facts plausibly suggesting he would be required to pay them to purchase a comparable Camaro.  Nor does Plaintiff identify any Policy term that requires GEICO to pay him an "average dealer fee."[10]  Without a requirement that he pay a dealer fee, or an allegation that he incurred one, Plaintiff has not plausibly alleged facts supporting the damages element of his breach of contract claim.

## V.   COUNT IV FAILS BECAUSE PLAINTIFF HAS NOT PLAUSIBLY ALLEGED GEICO CANNOT RETAIN THE SALVAGE FOR WHICH IT PAID

Plaintiff claims that because his Camaro was a total loss, GEICO owes him both the cost to replace the Camaro and the amount of any value the Camaro retained after the loss (*i.e.*, the salvage value).  *See* Compl., ¶¶ 27, 42 (demanding the retail cost of the Camaro); ¶¶ 35-36, 42 (demanding the salvage value of the Camaro).  Neither § 626.9743 nor the Policy supports— much less requires—such a windfall double-payment.

Section 626.9743 says nothing about salvage value or salvage title, and it cannot be construed to entitle Plaintiff to both pre-accident actual cash value *and* post-accident salvage value.  Likewise, Plaintiff does not and cannot identify any Policy term that entitles him to both pre-accident actual cash value *and* post-accident salvage value.

While Plaintiff conclusorily asserts that "no provision in the Policy (a) requires insureds to permanently transfer titles of their total loss vehicles to GEICO. . . or (b) provides for a deduction of salvage value from actual cash value payments . . . , " Compl., ¶ 36, this assertion is demonstrably false.  The Policy expressly states that where, as here, GEICO pays to "repair or

---

[10] Plaintiff also cites no Policy term requiring GEICO to assume an insured will buy their replacement vehicles from dealers, particularly if the insured did not purchase from a dealer in the first instance.

replace the damaged . . . property," it "may take all or part of the property at the agreed or appraised value:"

> **6.** PAYMENT OF *LOSS*
>
> We may at our option:
> (a) Pay for the *loss*; or
> (b) Repair or replace the damaged or stolen property.
>
> At any time before the *loss* is paid or the property replaced, we may return any stolen property to *you* or to the address shown in the declarations at our expense with payment for covered damage. <u>We may take all or part of the property at the agreed or appraised value, but there will be no abandonment to us.</u> We may settle claims for *loss* either with the ***insured*** or the owner of the property.

Policy, Ex. 1, at 16 (bold italics in original, underlining added).

Here, the Camaro is the "property" GEICO agreed to "replace," and the offered settlement payment is the "appraised value." *Id.* Once Plaintiff accepted the settlement payment, GEICO became entitled to the Camaro—the "property" it "replaced"—or the Camaro's remaining salvage value. *Id.*

The Policy's **Conditions** section also states:

> If we retain salvage, we have no duty to preserve or otherwise retain the salvage for any purpose . . . If *you* ask us immediately after a *loss* to preserve the salvage for inspection, we will do so for a period not to exceed 30 days. ***You*** may purchase the salvage from us if *you* wish.

Policy, Ex. 1, at 16. The Policy language allows GEICO to retain salvage at GEICO's choice. The insured (*i.e.*, "you", in the Policy) could not purchase the salvage from GEICO if GEICO were not permitted to retain it. Making a total loss payment thus entitles GEICO to the salvage vehicle. Plaintiff cannot justify his claim that GEICO breached a Policy term by either requiring him to transfer title to the totaled Camaro or deducting its salvage value from the settlement amount as part of the settlement transaction. *See* Compl., ¶ 36.

Case law also establishes that "when a damaged vehicle has some salvage value but the collision claim is settled on the basis of a total loss, the insurer is entitled to the property . . . ." *Langford v. Federated Guar. Mut. Ins. Co.*, 543 So. 2d 675, 677–78 (Ala. 1989) (collecting cases); *accord, e.g.*, *Sibley v. Insured Lloyds*, 442 So. 2d 627, 631 (La. Ct. App. 1983) ("When a vehicle is a total loss, the owner is entitled to recover the market value of the vehicle before the accident less its salvage value, if any.") (collecting cases); *Dwane v. W. Am. Ins. Co.*, 121 N.J. Super. 470, 478, 297 A.2d 865, 869 (Dist. Ct. 1972) (following a total loss, the insurer was entitled to the title and any salvage value).  An insured is not entitled to both pre-accident actual cash value *and* post-accident salvage value.  *E.g.*, *Fischer v. Travelers Ins. Co.*, 148 So. 2d 817, 818 (La. Ct. App. 1963) (". . . where an insurer settles on a basis of total loss, whatever salvage may remain belongs to the insurer, and [ ] if the owner desires to obtain that salvage he must do so by purchasing it from the insurer or by allowing a deduction from the settlement of the value thereof.").

The insured's recovery is limited to pre-accident actual cash value minus post-accident salvage value if the insured retains the totaled vehicle.  *E.g.*, *Measure Of Damages For Destruction Of Or Damage To Automobile Other Than Commercial Vehicle*, 169 A.L.R. 1100 (2016) ("Where the automobile cannot be repaired, later cases uphold the rule that the measure of damages is the difference between the market value of the automobile before injury and the salvage value of the wreckage.") (collecting cases); *Salvage Value*, 12A Couch on Ins. § 177:4 ("In the event that a collision results in the total loss of the insured automobile (excepting possibly a small amount for salvage), the measure of recovery under many collision insurance policies is the value of the vehicle immediately prior to the accident, or other maximum provided

by the policy, with a possible deduction for its salvage value."). The Policy does not permit

Plaintiff double recovery by obtaining the total value of the loss vehicle and its salvage value.

## VI.   PLAINTIFF'S CLAIMS SHOULD BE STAYED PENDING THE RESOLUTION OF *JONES V. GOVERNMENT EMPLOYEES*

Plaintiff is already a member of a class, certified on April 4, 2019, with the same parties

and overlapping issues. *Jones*, 2019 WL 1490703.[11] This Court has "broad discretion" to stay

this case "in order to avoid duplicating a proceeding already pending in another federal court."

*See Georgia ex. rel. Olens v. McCarthy*, 833 F.3d 1317, 1321 (11th Cir. 2016). As the Supreme

Court has explained:

> [T]here are principles ... which govern in situations involving the contemporaneous exercise of concurrent jurisdictions ... by federal courts.... These principles rest on considerations of wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.... As between federal [ ] courts ... the general principle is to avoid duplicative litigation.

*Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976) (citations,

quotation marks, and parentheses omitted).

The parties in *Jones* and here overlap: GEICO is a defendant in both actions, and Plaintiff

is a member of the *Jones* class. There is also overlap between the issues and relief sought in

*Jones* and the putative class here. Both actions define the class to include Florida GEICO

policyholders who suffered a first-party loss to a covered vehicle that was treated as a total loss,

and deal with GEICO's practices in adjusting and settling total loss claims for Florida

---

[11] Plaintiff concedes these cases overlap. Doc. 16 (identifying *Jones* as a related case). The *Jones* class comprises:

> All Florida residents insured for [private passenger auto] physical damage coverage by [GEICO] who suffered a first party loss of a covered owned (i.e., not leased) vehicle at any time during the five (5) years prior to the filing of this lawsuit through the date of class certification, whose claims were adjusted by a Defendant as a total loss claim, whose claims resulted in payment by a Defendant of a covered claim, and who were not paid title fees and/or license plate transfer fees.

2019 WL 1490703, at *8. Plaintiff alleges he suffered a first-party total loss of a covered vehicle during this class period. Compl. ¶ 37.

policyholders, the payment of collateral fees in those claims, and the allegation that those collateral fees should be paid as part of the "actual cash value" of the total loss vehicle.  Compl. ¶¶ 1-4; *Jones*, 2019 WL 1490703, at *1-2.

*Jones* is nearing its end, as the parties there filed a notice of settlement on October 29, 2019.  *Jones*, 6:17-cv-891-Orl-40LRH, Docket at 191.  Depending on the settlement ultimately entered, some or all of Plaintiff's claims may be resolved.  This case should be stayed until *Jones* reaches finality if the Court does not dismiss.

**IV.** **CONCLUSION**

For the foregoing reasons, GEICO requests the Court dismiss all of Plaintiff's claims with prejudice, or stay this case pending the resolution of *Jones*.

Respectfully submitted,

*/s/ John P. Marino*
John P. Marino (FBN: 814539)
Lindsey R. Trowell (FBN: 678783)
Kristen L. Wenger (FBN: 92136)
SMITH, GAMBRELL & RUSSELL, LLP
50 North Laura Street, Suite 2600
Jacksonville, Florida 32202
Phone: (904) 598-6100
Facsimile: (904) 598-6204
jmarino@sgrlaw.com
ltrowell@sgrlaw.com
kwenger@sgrlaw.com

-and-

Dan W. Goldfine (ABN: 018788)
(admitted *pro hac vice*)
Ian Fischer (ABN: 026239)
(admitted *pro hac vice*)
Brian J. Hembd (ABN: 029817)
(admitted *pro hac vice*)
Elizabeth B. N. Garcia (ABN: 032209)
(admitted *pro hac vice*)
HUSCH BLACKWELL LLP
5060 North 40th Street, Suite 250
Phoenix, Arizona 85018
Phone: (480) 824-7900
Facsimile: (480) 824-7905

Dan.goldfine@huschblackwell.com
Ian.fischer@huschblackwell.com
Brian.hembd@huschblackwell.com
Elizabeth.garcia@huschblackwell.com

*Attorneys for Government Employees Insurance Company*

## CERTIFICATE OF SERVICE

I certify that on November 21, 2019, the foregoing document is being served on the all counsel included in the Service List below, either by transmission of Notices of Electronic Filing generated by CM/ECF or via electronic mail.

*/s/ John P. Marino*
Attorney

**SERVICE LIST**

Lindsey R. Trowell (FBN 678783)
John P. Marino (FBN 814539)
Kristen L. Wenger (FBN 92136)
Smith, Gambrell & Russell, LLP
50 North Laura Street - Suite 2600
Jacksonville, Florida 32202
Phone:  (904) 598-6100
Facsimile:  (904) 598-6204
ltrowell@sgrlaw.com
jmarino@sgrlaw.com
kwenger@sgrlaw.com

Dan W. Goldfine (ABN: 018788)
(*admitted pro hac vice*)
Ian Fischer (ABN: 026239)
(*admitted pro hac vice*)
Brian Hembd (ABN: 029817)
(*admitted pro hac vice*)
Elizabeth B. N. Garcia (ABN: 032209)
(*admitted pro hac vice*)
HUSCH BLACKWELL LLP
5060 North 40th Street, Suite 250
Phoenix, Arizona 85018
Phone: (480) 824-7900
Facsimile: (480) 824-7905
Dan.goldfine@huschblackwell.com
Ian.fischer@huschblackwell.com
Brian.hembd@huschblackwell.com
Elizabeth.garcia@huschblackwell.com

*Attorneys for Government Employees*
*Insurance Company*

Scott R. Jeeves, Esq.
The Jeeves Law Group, P.A.
954 First Avenue North
St. Petersburg, FL 33705
Phone: (727)894-2929
sjeeves@jeeveslawgroup.com
khill@jeeveslawgroup.com
lawclerk@jeeveslawgroup.com
rmandel@jeevesmandellawgroup.com

Craig E. Rothburd, Esq.
Craig E. Rothburd, P.A.
320 W. Kennedy Blvd., Suite 700
Tampa, FL 33606
Phone:  (813)251-8800
crothburd@e-rlaw.com
maria@rothburdpa.com

Casim Adam Neff, Esq.
Neff Insurance Law, PLLC
P.O. Box 15063
St. Petersburg, FL 33733-5063
Phone: (727)342-0617
cneff@neffinsurancelaw.com

Edward H. Zebersky, Esq.
Mark S. Fistos, Esq.
Zebersky Payne, LLP
110 S.E. 6th Street, Suite 210
Ft. Lauderdale, FL 33301
Phone: (954)989-6333
ezebersky@zpllp.com
mfistos@zpllp.com

Alec H. Schultz, Esq.
León Cosgrove, LLP
255 Alhambra Circle, Suite 800
Coral Gables, FL 33134
Phone: (305)740-1975
aschultz@leoncosgrove.com

*Attorneys for Plaintiff*

/s/ John P. Marino
Attorney